## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | | |
|---|---|---|---|
| ISRAEL RUIZ, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. | 20 C 50429 |
| | ) | | |
| STANLEY CARADINE, LAURA EMMOLE, | ) | Judge Rebecca R. Pallmeyer | |
| JENNIFER FERRIS, SAM PAYNE, and | ) | | |
| CHRISTINE TERRY, | ) | | |
| | ) | | |
| Defendants. | ) | | |

### <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Israel Ruiz, who is incarcerated at the Dixon Correctional Facility ("Dixon") in the Illinois Department of Corrections ("IDOC"), alleges that between December 2019 and March 2020, facility staff were deliberately indifferent to a serious medical need—specifically, his need for dental care. In his complaint under 42 U.S.C. § 1983, Ruiz asserts that his repeated complaints of swelling, bleeding, and pain in his gums went unanswered by medical and correctional staff at Dixon. Named Defendants are correctional counselors Sam Payne and Christine Terry, registered nurses Laura Emmole and Jennifer Ferris, and Dr. Stanley Caradine, a dentist who works for Wexford Health Services and was assigned to Dixon at the time of Plaintiff's alleged injuries. The IDOC Defendants (Payne, Terry, Emmole, and Ferris), and Dr. Caradine have moved for summary judgment, arguing that no reasonable jury could find that they acted with deliberate indifference to a serious medical condition. The court agrees, and Defendants' motions are granted.

## BACKGROUND

In preparing the following factual account, the court relies on the parties' statements of undisputed material facts and responses, pursuant to this court's Local Rule 56.1.[1]

## I.     Factual Background

### A.     The Parties

Plaintiff Israel Ruiz, an inmate at IDOC, has been incarcerated at Dixon Correctional Facility since approximately February 2019.  (IDOC SOF ¶ 1.)

Defendants Ferris and Emmole are registered nurses employed by Dixon.  (*Id*. ¶¶ 4–5.) Nurses at Dixon are not authorized to diagnose inmates, order medical testing, or refer inmates for outside medical care.  (*Id*. ¶¶ 15, 19.)  Their responsibilities are limited to screening inmates during sick calls, making notes in inmate medical charts, providing over-the-counter medication, and putting inmates on a list to be seen by a nurse practitioner or doctor.  (*Id*. ¶ 16, 21.)  Emmole

---

[1]     The submissions will be cited as the following: IDOC Defs.' Rule 56.1 Statement of Undisputed Material Facts [126] (hereinafter "IDOC SOF"); Caradine's Rule 56.1 Statement of Undisputed Material Facts [114] (hereinafter "Caradine SOF"); Pl.'s Rule 56.1(b)(3) Statement of Additional Facts [132] (hereinafter "PSOAF"); Pl.'s Resp. to IDOC Defs.' Rule 56.1 Statement [134] (hereinafter "Pl.'s Resp. to IDOC SOF"); Pl.'s Resp. to Caradine's Rule 56.1 Statement [133] (hereinafter "Pl.'s Resp. to Caradine SOF"); IDOC Defs.' Resp. to Pl.'s 56.1(b)(3) Statement [139] (hereinafter "IDOC Resp. to PSOAF"); Caradine Resp. to Pl.'s Rule 56.1(b)(3) Statement [138] (hereinafter "Caradine Resp. to PSOAF").

Defendants have objected to Plaintiff's citation to allegations in his amended complaint as evidence in support of his Rule 56.1(b)(3) Statement of Additional Facts.  (*See* PSOAF ¶¶ 1–3; IDOC Resp. to PSOAF ¶ 1.)   Plaintiff is correct that the court can accept, as equivalent to an affidavit, statements in a verified complaint.  *Silva v. Mitchell*, No. 18 C 1300, 2021 WL 4477959, at *12 (N.D. Ill. Sept. 30, 2021); *Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013) ("A verified complaint is the equivalent of an affidavit for summary judgment purposes.")  Though his complaint is not notarized, Plaintiff has attested to the truth of his allegations with a statement acknowledging that if this certification is not correct, he will be subject to sanctions.  Affidavits must ordinarily be "sworn before an officer authorized to administer an oath, such as a notary public."  *Zavala-Alvarez v. Darbar Mgmt., Inc.*, 617 F. Supp. 3d 870, 885–86 (N.D. Ill. 2022).  An unrepresented prisoner may face difficulties in obtaining notarization, but the court need not address the matter further.  Apart from a single paragraph in Plaintiff's Rule 56.1(b)(3) statement that cites only to the amended complaint (and is not relevant to this ruling) (*see* PSOAF ¶ 1), Plaintiff's citations to the amended complaint are accompanied by citations to depositions and documentary evidence.  Those materials are properly before the court.  (*See id*. ¶¶ 2–3.)

has no training in dentistry and cannot perform dental cleanings. (*See id*. ¶ 20.) Defendants have not offered corresponding information concerning Ferris, but the court assumes she, too, is not trained to perform dental work. Plaintiff's claims against Ferris and Emmole arise from a single interaction with each nurse during sick calls on December 5, 2019, and February 22, 2020, respectively. (*Id*. ¶¶ 14, 18.)

Defendants Terry and Payne were correctional counselors during the relevant time period. (*Id*. ¶¶ 2–3.) Correctional counselors perform duties as "regular" counselors or "caseload counselors" and "grievance officers." (*See* Payne Dep. Tr. [126-2] at 13:9–14.) A caseload counselor is assigned to specific housing units and provides, for inmates within those units, "paperwork that they need, . . . information on how to transfer to another facility, . . . [assistance with] visit lists, phone lists." (*Id*. at 13:14–22.) Caseload counselors cannot help with anything "that would be handled by medical or security personnel" beyond directing the inmate to the proper resource. (*Id*. at 13:22–24, 14:21–15:3.) They do not perform medical or mental health counseling. (*Id*. at 14:12–20.)

When an inmate seeks to file an official grievance, the caseload counselors receive the written grievance and perform a first-level review before sending the grievance to the grievance office. (*Id*. at 33:17–23; *see also* Payne Grievance Resps. [126-3].) This first-level review includes some amount of fact-finding to determine whether "claims could potentially be real or be made up." (Terry Dep. Tr. [126-4] at 22:6–19.) A grievance officer (who, despite the different role, also has the title of "correctional counselor") performs a second-level review of an official grievance once the caseload counselor has completed the initial response. (*See* Payne Dep. Tr. at 33:20–23.) As part of this second-level review, the grievance officer "[i]nvestigate[s] the claims made on the grievance," including reaching out for information from any staff member identified in the grievance. (Terry Dep. Tr. at 12:23–13:4; 14:17–25.) The grievance officer's determination on a grievance is then subject to review by the Chief Administrative Officer at Dixon; that officer's ruling can be appealed to IDOC's Administrative Review Board ("ARB"). (*See, e.g.,* Terry

Grievance Resps. [126-5] at 2–3, 6–7, 9–10 (showing process of review by Chief Administrative Officer and ARB).)  Grievance officers may address allegations of staff misconduct or unfair treatment through the grievance process, but they may not prescribe or order medical treatment, refer inmates to providers in or outside the facility, or overrule a licensed physician's determined course of treatment.  (IDOC SOF ¶¶ 7, 11; Terry Dep. Tr. at 41:21–42:20, 66:3–16.)

During the relevant period of Plaintiff's claims, Defendant Payne was a caseload counselor at Dixon (Payne Dep. Tr. at 13:4–14) and Defendant Terry was a grievance officer (Terry Dep. Tr. at 9:1–10).  Plaintiff's claims against Payne and Terry arise from a series of official grievances submitted on December 9, 2019; February 25, 2020; and March 9, 2020—Payne performed the first-level review and Terry performed the second-level review for each.  (*See generally* Payne Grievance Resps.; Terry Grievance Resps.)

Defendant Caradine, a licensed dentist, has been employed by Wexford Health Services since March 1, 2000.  (Caradine SOF ¶ 2.)  Between 2019 and 2020, Dr. Caradine was assigned to Sheridan Correctional Center (a different IDOC facility), but spent two weeks in March 2020 on temporary assignment to Dixon while Dixon's regular dentist (not identified in the record) was on leave.  (*Id.* ¶ 9.)  At Dixon, Dr. Caradine performed general dental services, including dental exams, fillings, and tooth extraction.  (Caradine SOF ¶ 2.)  Dr. Caradine is capable of cleaning patients' teeth, as well, and has done so in the past, but does not perform dental cleanings as part of his services for Dixon. (*Id.*; Caradine Resp. to PSOF ¶¶ 25, 26.)  During his temporary assignment at Dixon, Dr. Caradine treated Plaintiff on a single occasion on March 5, 2020. (Caradine SOF ¶ 10.)

B. **Plaintiff's Medical Care at Dixon**

Plaintiff's claims against Ferris, Emmole, and Caradine arise from the treatment he received for dental pain between December 2019 and March 2020.  Plaintiff made a series of sick

call requests concerning dental pain on or before December 5, 2019.[2] (*See* IDOC SOF ¶ 17.) In those requests (which are not in the record), Plaintiff included complaints of both back pain and pain in his gums. (*Id.*) Plaintiff testified that at the time of his sick call request in December 2019, he was experiencing painful swelling and bleeding in his gums, despite routine brushing and flossing. (Pl.'s Dep. Tr. at 20:21–21:6.) On December 5, 2019, Plaintiff presented to Dixon's sick call and was treated by Defendant Nurse Ferris. (IDOC SOF ¶ 17.) As reflected in Ferris' progress notes from that appointment, the focus was on Plaintiff's claims of back pain (*see* Ferris Progress Notes at 1 ("Back Pain" in heading)), but Ferris addressed both Plaintiff's back pain as well as his complaints of gum "discomfort." (*Id.*) With respect to his back pain, Ferris instructed Plaintiff on "body mechanics" and advised him to refrain from weightlifting. (*Id.*) As for the gum pain, Ferris notes show that Plaintiff reported only "discomfort" in his gums, and that she instructed him on proper brushing and flossing to alleviate the discomfort. (*Id.* at 1–2.) Ferris also documented in her notes that Plaintiff did not believe he had any cavities, and that there was no dental hygienist available to perform a cleaning. (*Id.* at 2.) Plaintiff claims that, in that appointment, he explained to Ferris that he was experiencing "severe pain" to the point of "being sleep deprived," but no reference to such pain appears in Ferris' progress notes. (*See* Pl.'s Dep. Tr. at 23:5–17.) At the conclusion of Plaintiff's visit, Ferris placed Plaintiff on a list to see a nurse practitioner; notes from that appointment, which took place on December 9, are attached to Ferris' December 5 progress note and make mention only of Plaintiff's back pain. (*See* Ferris Progress Notes at 3; IDOC SOF ¶ 17.)

Plaintiff's dental problem persisted, however, and Plaintiff continued to submit sick call requests regarding swelling and pain in his gums. (Pl.'s Dep. Tr. at 24:15–22.) His next sick call

---

[2] It is unclear from the record how many sick call requests Plaintiff submitted prior to his first medical appointment at Dixon. Plaintiff suggests that he submitted a "number of sick calls" prior to December 5, 2019. (Pl.'s Dep. Tr. [114-1] at 20:1–8.) Ferris' notes from the December 5 appointment suggest that there were at least two requests: one complaining of back pain and a different request relating to gum pain. (Ferris Progress Notes [126-8] at 2.)

visit was on February 7, 2020, specifically to address his complaints of tooth and dental pain. (February 7 Progress Notes [114-2] at 7–8.)[3]   The sick call nurse's progress notes from the February 7 appointment show that Plaintiff was experiencing pain on a scale of "9/10," but the nurse did not observe bleeding, difficulty swallowing, or compromised airways.   (*See id*. at 7.) The notes also show that Plaintiff refused pain medication (acetaminophen) (*id*.), consistent with Plaintiff's own testimony that he did not believe pain medication would be effective for his gum pain.   (*See* Pl.'s Dep. Tr. at 31:23–25 ("[T]he pain I was in from my gums, Tylenol wasn't going to do nothing for that.").)[4]  Finally, the progress note shows that the nurse put in a referral for Plaintiff to see a dentist, for a "non-emergent condition."   (*Id*. at 8.)

Plaintiff returned to sick call two weeks later, on February 22, 2020, with complaints of "non-specific discomfort," and was seen by Defendant Emmole.   (*See* Emmole Progress Notes [126-10].)   Emmole's notes from the appointment state that Plaintiff's gums (top and bottom) were in "constant" pain at an "8/10" pain level.   (*Id*.)   Plaintiff testifies that he told Emmole that the bleeding and pain in his gums were leading to sleep deprivation, and that he had not had his teeth cleaned in six years.   (Pl.'s Dep. Tr. at 25:18–24.)   According to Emmole's progress notes, however, there were no signs of obvious discomfort, and Plaintiff's gums were not bleeding at the time.   (*See* Emmole Progress Notes at 1.)   Plaintiff denied needing Tylenol or Motrin (ibuprofen) for his pain.   (*Id*.; Emmole Dep. Tr. [126-9] at 90:25–91:6.)   Emmole's notes show that Plaintiff

---

[3]      Neither Plaintiff nor the IDOC Defendants mention this medical appointment in their Rule 56.1 statements, but Caradine attaches the progress report as an exhibit to his declaration.   (*See* [114-2] at 7–8.)   The exhibit attached to Caradine's declaration does not identify the registered nurse who evaluated Plaintiff on February 7, 2020, but Plaintiff does not contest the accuracy of the document.   (*See* Pl.'s Resp. to Caradine SOF ¶ 7.)

[4]      The record is not clear whether Plaintiff based this refusal on past attempts to use pain medication to help with his symptoms, or on his own opinion about the efficacy of the drugs. In Ferris' progress notes from the December 5 sick call appointment, she notes "IBS" next to the word "ibuprofen" (perhaps a reference to Irritable Bowel Syndrome, though the parties do not explain this) and "didn't help" next to "acetaminophen," suggesting that the medications had been unhelpful or medically unavailable in the past.   (Ferris Progress Notes at 1.)

was "[a]dded to Dental," meaning that Plaintiff was being referred to see a dentist. (IDOC SOF ¶ 21; *see also* Pl.'s Resp. to Caradine SOF ¶ 8.)

Plaintiff was in fact seen by a dentist, Defendant Caradine, on March 5, 2020. (Caradine SOF ¶ 10.)[5] Plaintiff reported to Dr. Caradine that his gums were swollen. (*Id.*) Dr. Caradine evaluated Plaintiff's gums and diagnosed him with gingivitis.[6] (*Id.*) It is undisputed that Dr. Caradine instructed Plaintiff to maintain good oral hygiene—including using a toothbrush, toothpaste, and regular flossing—to resolve the gingivitis, and advised Plaintiff to seek prophylactic dental treatment upon his release (which Plaintiff notes would be, at earliest, in 2038). (*See* Pl.'s Resp. to Caradine SOF ¶ 10.) It is further undisputed that Plaintiff did not present to Caradine with periodontitis,[7] bone loss, or pocket depths. (*See* Caradine SOF ¶ 13; Pl.'s Resp. to Caradine SOF ¶ 13.) In addition to recommending good oral hygiene, Plaintiff asserts, Caradine also advised Plaintiff to "keep filing grievances." (*See* Pl.'s Resp. to Caradine SOF ¶ 11.) Plaintiff testified that Caradine told him to do so in a "hostile manner," but admitted in response to Caradine's Rule 56.1 statement that Caradine advised him to "keep doing what you're doing," and that Plaintiff interpreted this statement to mean that he should keep filing grievances. (*See* Pl.'s Resp. to Caradine SOF ¶ 11.) Caradine himself asserts that he was not even aware of Plaintiff's prior grievances against Dixon. (*Id.*; *see also* Caradine Decl. [114-2] ¶ 7.) Dr.

---

[5]     The record is inconsistent on what specific day this appointment occurred. According to Plaintiff, this appointment occurred on March 4, 2020. (Pl.'s Dep. Tr. at 26:19–21.) Caradine asserts that the appointment occurred on March 5, 2020. (Caradine SOF ¶ 10.) IDOC's internal documents, generated in response to Plaintiff's formal grievances, suggest that the appointment occurred on March 6, 2020. (*See* Terry Grievance Resps. at 9–10.) Because the parties, in their briefing, commit to March 5 as the date of appointment, the court accepts that date as accurate.

[6]     Gingivitis is defined as "[i]nflammation of the [gums] as a response to bacterial plaque on adjacent teeth." *Gingivitis*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[7]     Periodontitis is the inflammation of the "periodontium," the "connective tissue that surrounds the tooth root and attaches it to its bony socket." *Periodontitis, periodontium*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

Caradine did not clean Plaintiff's teeth during the appointment on March 5, 2020 (PSOAF ¶ 28), and Plaintiff does not dispute that Dr. Caradine "believed that his job in March 2020 did not include cleaning patient's teeth." (*Id*. ¶ 30).

Following that March 5, 2020, appointment, there is no record of another medical appointment for Plaintiff until July 30, 2020, when Plaintiff was seen by another dentist, Dr. John Schmidt. (PSOAF ¶ 33; *see* Caradine Dep. Tr. [114-3] at 113:20–114:25.) Little information about this appointment is available; Defendant Caradine was questioned at his deposition about notes from this July 30 appointment, but the notes are not in the record. According to Dr. Caradine, Dr. Schmidt's notes show that Plaintiff was still complaining of bleeding and swelling in his gums as of July 30, 2020, that Dr. Schmidt recognized that Plaintiff continued to suffer from gingivitis, and that Dr. Schmidt again instructed Plaintiff to brush in the inflamed area. (*Id*. at 113:20–24; 114:15–22.)

### C.   Plaintiff's Official Grievances

Plaintiff's claims against the correctional counselors (Terry and Payne) arise from their handling of three written grievances submitted between December 2019 and March 2020. Plaintiff filed the first grievance on December 9, 2019, alleging misconduct on behalf of Nurse Ferris (erroneously called "Nurse Bueller" in the grievance)[8] during his December 5, 2019, sick call appointment. (*See* Payne Grievance Resps. at 1.) In providing the "nature of grievance" portion of the form, Plaintiff listed "staff conduct," "medical treatment," and "other: dental condition." (*Id*.) Plaintiff recounted in his grievance that in response to his complaints of gum pain, Ferris had told him that "[y]ou will not see a dentist as we don't clean teeth here at Dixon C.C." and "sorry, I can't help you." (*Id*.) He specifically requested that he "be treated for his dental condition" and that Ferris be fired. (*Id*.)

---

[8]      It appears that this misunderstanding arose because Ferris occasionally provides her name to patients as "Ferris like Bueller or Ferris like wheel," leading to Plaintiff thinking her name was "Bueller." (*See* Ferris Dep. Tr. [126–6] at 51:2–10.)

Defendant Payne, as a correctional counselor assigned to Plaintiff's unit, received the grievance on April 20, 2020, and performed a first-level review. (*See id.*) The reason for the four-month delay between Plaintiff's filing and Payne's receipt of this grievance (and similar delays with respect to Plaintiff's other grievances) is not explained by either party, though Plaintiff does not appear to fault Payne for this. As part of that review, she reached out to the Dixon Healthcare Unit, connecting with "M. Carpenter R.N." (another registered nurse), and confirmed that no dental hygienist was available to perform dental cleanings at Dixon. (*Id.*) Payne took no further action on the grievance before passing it onto the grievance office for further review.

Defendant Terry received the December 9 grievance on April 21, 2020, for a second-level review. (*See* Terry Grievance Resps. at 2.) With reference to Plaintiff's complaints against a "Nurse Bueller," Terry observed that there was no "Nurse Bueller" on staff at Dixon, meaning that Plaintiff's December 9 grievance was not in compliance with Dixon's official procedures for grievances against staff conduct. (*Id.*) Terry recommended that the grievance be denied on that basis alone. (*Id.*) On August 21, 2020, the Chief Administrative Officer at Dixon concurred with Terry's conclusion (*id.*), and after Plaintiff appealed the denial to the ARB, the denial was affirmed because "per facility there is no Nurse Bueller" (*id.* at 3).

Plaintiff filed his second formal grievance on February 25, 2020, asserting that Nurse Emmole (called "Nurse Emily" in the grievance) did not provide any treatment for his claims of severe swelling and pain in his gums. (*See* Payne Grievance Resps. at 2.) In the grievance, he requested "an explanation in writing as to what nurse Emily did for Ruiz severe pain and suffering" as well as "an explanation as to why Ruiz is not being called to see a dentist." (*Id.*)

Payne received the grievance on May 4, 2020, and performed a first-level review. In this review, Payne confirmed (again with Nurse Carpenter) that Plaintiff was seen at sick call on February 22, 2020, for his complaints of gum pain and "referred to dental." (*Id.*) Payne also noted that in early March, just days after Plaintiff filed the grievance, he in fact had an appointment with Dr. Caradine. (*Id.*)

9

Defendant Terry performed a second-level review of the February 25 grievance on May 5, 2020.  (*See* Terry Grievance Resps. at 6.)  She consulted Plaintiff's records, reviewed Nurse Carpenter's statements in Payne's response, and reached out to Emmole directly regarding Plaintiff's allegations of misconduct.  (*Id.*)  In recommending that the grievance be denied, Terry found that Nurse Emmole properly "triage[d] the complaints according to established protocol" and noted that "all treatment must be ordered by the licensed physician at this facility and not a matter of inmate preference."  (*Id.*)  Terry further noted that she "has no authority to evaluate clinical decisions made by licensed physicians."  (*Id.*)  On August 31, 2020, the Chief Administrative Officer at Dixon concurred with Terry's determination, and the ARB affirmed the denial on September 4, 2020, noting that "[s]taff misconduct allegation was not substantiated" and "[o]ffender was referred to dental by nurse on 2/22/20, and seen on 3/6/20."  (*Id.* at 6–7.)

Finally, on March 9, 2020, Plaintiff filed a third official grievance, claiming that Defendant Caradine had committed misconduct by telling him, in response to his complaints of pain, that "there's nothing he can do," and that Caradine had told Plaintiff to keep "writing grievances." (Payne Grievance Resps. at 4.)  Plaintiff sought relief in the form of "[a] written explaination [sic] as to what Dentist Caradean [sic] did to treat Ruiz for painful, swollen, bleeding gums" and "if he did nothing that disciplinary action be taken against him and Ruiz rushed to the hospital for treatment." (*Id.*)

Payne received the March 9 grievance on March 30, 2020, and investigated the grievance by speaking to Dr. Schmidt, the other dentist who had provided treatment at Dixon.  (*See id.*)  As recounted in Payne's response, Dr. Schmidt confirmed that Plaintiff was seen on "March 6, 2020," by Dr. Caradine, presenting with complaints of swollen, bleeding gums.  (*Id.*)  Schmidt further reported to Payne that "Patient was diagnosed with plaque related gingivitis consistent with inadequate oral hygiene" and that "oral hygiene was reinforced" in the appointment. (*Id.*)  Schmidt clarified that Plaintiff's complaints of sleep deprivation from the gum pain "have not been raised here at Dixon, but at previous correction centers."  (*Id.*)

Terry received Payne's report and performed a second-level review of the grievance on April 10, 2020. (Terry Grievance Resps. at 9.) Terry, who does not appear to have conducted a separate investigation apart from reviewing Dr. Schmidt's comments to Payne, recommended that the grievance against Caradine be denied on the basis that "offender Ruiz cannot substantiate claim and has access to dental care." (*Id*.) In so finding, Terry observed that "all treatment must be ordered by the Medical Practitioner (Dentist) and not a matter of inmate preference" and reiterated that she "has no authority to evaluate clinical decisions made by licensed physician." (*Id*.) On August 19, 2020, the Chief Administrative Officer at Dixon concurred with Terry's denial, and the ARB affirmed the denial on August 28, 2020, holding that the claim was "unsubstantiated against staff-dentist Caradean[sic]" and "all treatment given is at discretion of medical staff." (*Id*. at 9–10.)

In handling Plaintiff's three successive grievances, it is undisputed that Payne and Terry "consulted the facility healthcare staff to confirm that Plaintiff was receiving treatment for his complaints related to his gums," and "deferred to the judgment of facility medical staff on issues related to Plaintiff's medical treatment." (*See* Pl.'s Resp. at IDOC SOF ¶¶ 8–9, 12–13.)

## II. Procedural Background

Plaintiff filed his original complaint [1] on November 4, 2020, naming existing Defendants as well as Wexford Health Sources (Caradine's employer), Dave White (a member of the ARB), and several individuals employed by Hill Correctional Center ("Hill"), where Plaintiff was housed before being transferred to Dixon and where he claimed to have also received inadequate dental care. (*See* Original Comp. at 4–7.) On December 10, 2020, Judge Reinhard dismissed the original complaint without prejudice, holding that Plaintiff's claims against the Hill defendants were mis-joined with his claims arising from his treatment at Dixon. (Order [7] at 2–3.) On January 8, 2021, Judge Reinhard accepted Plaintiff's amended complaint [12] against the Dixon-affiliated

defendants,[9] but dismissed Wexford and White as defendants, holding that Plaintiff failed to state a claim against either. (Order [13] at 2–3.) Plaintiff filed the second amended complaint [54] (changing "Nurse Bueller" to "Nurse Ferris") on September 13, 2021. After almost three years of discovery, Defendant Caradine [113] and the IDOC Defendants [124] moved for summary judgment on July 15, 2024, and August 16, 2024, respectively. The motions are now fully briefed.[10]

## LEGAL STANDARD

"Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

This case involves deliberate indifference claims under the Eighth Amendment, actionable against state prisons and their staff via the Fourteenth Amendment and 42 U.S.C. § 1983. *Estelle*

---

[9]      Plaintiff then separately sued the Hill defendants in an action brought in the Central District of Illinois—Judge Shadid, presiding over the case, granted summary judgment in favor of the defendants on January 18, 2024. *See Ruiz v. Strow*, No. 20-CV-4267, 2024 WL 464029 (C.D. Ill. Jan. 18, 2024). In November 2024, the Seventh Circuit affirmed Judge Shadid's grant of summary judgment, finding that Plaintiff failed to present evidence that the Hill defendants were deliberately indifferent. *Ruiz v. Strow*, No. 24-1172, 2024 WL 4719622, at *2 (7th Cir. Nov. 8, 2024). Interestingly, in granting summary judgment to the Hill defendants, Judge Shadid mentions appointments at which Dr. Caradine treated Plaintiff on February 3, 2019, July 30, 2020, and July 27, 2021, *Ruiz*, 2024 WL 464029, at *2, contrary to Caradine's undisputed statement in this case that "[o]n March 5, 2020, Dr. Caradine saw Plaintiff for the first and only time." (Pl.'s Resp. to Caradine SOF ¶ 10.) There is no evidence of these additional appointments in the record, however, and neither party asks the court to take judicial notice of Judge Shadid's recitation of the facts. The court thus accepts the parties at their word that there was only one appointment between Plaintiff and Defendant Caradine.

[10]      The parties' briefs will be cited as follows: Caradine Mem. in Support of Mot. for Summ. J. [115] (hereinafter "Caradine Mem."); IDOC Defs.' Mem. in Support of Mot. for Summ. J. [125] (hereinafter "IDOC Mem."); Pl.'s Resp. in Opp. to Caradine Mem. [135] (hereinafter "Pl.'s Caradine Opp."); Pl.'s Resp. in Opp. to IDOC Mem. [136] (hereinafter "Pl.'s IDOC Opp."); Caradine's Reply in Support of Mot. for Summ. J. [137] (hereinafter "Caradine Reply"); and IDOC Defs.' Reply in Support of Mot. for Summ. J. [140] (hereinafter "IDOC Reply").

*v. Gamble*, 429 U.S. 97, 104–05 (1976). "To forge a successful claim of deliberate indifference, [Plaintiff] must demonstrate that the defendants had subjective knowledge of the risk to the inmate's health and disregarded that risk." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This involves both an objective and subjective element. "The objective component is that the prisoner must have been exposed to a harm that was objectively serious." *Balsewicz v. Pawlyk*, 963 F.3d 650, 654 (7th Cir. 2020), *as amended* (July 2, 2020) (citing *Farmer*, 511 U.S. at 834). "The subjective component requires the plaintiff to demonstrate that the prison official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and he must have 'draw[n] th[at] inference.'" *Stewart*, 14 F.4th at 763 (citing *Balsewicz*, 963 F.3d at 654–55). In other words, "[the court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).

## DISCUSSION

In their briefs, Defendants challenge both the objective and subjective prongs of the deliberate indifference analysis. First, they contend that Plaintiff's swelling, bleeding, and pain in his gums relating to diagnosed gingivitis is not an objectively serious medical condition. (*See* IDOC Mem. at 10; Caradine Mem. at 5.) Second, they contend that their respective actions towards Plaintiff did not amount to deliberate indifference, even assuming *arguendo* that his condition was serious. (IDOC Mem. at 6, 9; Caradine Mem. at 7.) Because the existence of a serious medical condition is a threshold question for establishing deliberate indifference, the court begins there.

### I.      Objectively Serious Medical Condition

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need

for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quotation marks omitted). To be "objectively serious," the condition need not be life threatening; "rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id*. The Seventh Circuit has reiterated that "dental care is one of the most important medical needs of inmates," and "dental pain accompanied by various degrees of attenuated medical harm may constitute an objectively serious medical need." *Board v. Farnham*, 394 F.3d 469, 480 (7th Cir. 2005).

Relying mainly on Dr. Caradine's professional judgment, Defendants contend that Plaintiff's diagnosed gingivitis was not an objectively serious medical condition for purposes of a claim under the Eighth Amendment. (Caradine Mem. at 5.) Dr. Caradine asserts in his declaration that "[g]ingivitis is not a serious medical condition, but is a common, mild problem that is completely reversible by maintaining proper oral hygiene daily." (Caradine Decl. ¶ 14.) Defendants go on to cite district court rulings—one involving this Plaintiff—that a plaintiff's gingivitis did not amount to an objectively serious medical condition. (*See* Caradine Mem. at 5 (citing *Ruiz v. Strow*, 2024 WL 464029;[11] *Stevenson v. Scholz*, No. 07-3108, 2009 WL 790961 (C.D. Ill. Mar. 23, 2009)).)

Defendants' arguments are forceful, and the court has no reason to doubt Dr. Caradine's professional knowledge, but disputes of fact preclude summary judgment on the question of

---

[11]    In his reply brief, Caradine suggests that collateral estoppel prevents Plaintiff from contesting that his dental condition is a serious medical condition, because Judge Shadid previously found that his gingivitis did not amount to an objectively serious medical condition in his opinion granting summary judgment. (Caradine Reply at 2.) As a preliminary note, the court observes that Caradine did not raise the issue of collateral estoppel prior to his reply brief, despite knowing of (and citing) Judge Shadid's prior ruling at the time of his initial memorandum. In any event, collateral estoppel, or issue preclusion, requires that "the issue decided in the prior adjudication is identical with the one presented in the suit in question." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 356 (7th Cir. 2010). The issue before Judge Shadid—whether Plaintiff's gum disease was a serious medical condition during his time at Hill Correctional Center between 2017 and 2019—is not identical to the question before the court now: whether Plaintiff's dental pain was objectively serious at Dixon between 2019 and 2020. Judge Shadid's order, while persuasive, does not preclude Plaintiff from challenging his medical care while at Dixon.

whether the "severe pain" Plaintiff claims he experienced was objectively serious. As Plaintiff notes, his deliberate indifference claim is not based on Defendant's alleged indifference to his gingivitis diagnosis, but on his complaints of severe pain and bleeding in his gums. (*See* Pl.'s IDOC Opp. at 6.) Indeed, "deliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim." *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1039–40 (7th Cir. 2012); *see also Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury *or* unnecessarily prolonged an inmate's pain.") (emphasis added). This is particularly true if a plaintiff's severe pain is "so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Plaintiff testified that throughout his time at Dixon, he was experiencing pain in his gums at "8/10" and "9/10" levels, and that the pain was so severe that it was causing sleep deprivation. (*See* Pl.'s Dep. Tr. at 20:21–21:6, 31:9–17; February 7 Progress Notes at 7; Emmole Progress Notes at 1.) True, Plaintiff's refusal to take over-the-counter pain and anti-inflammatory medication, and the absence of evidence of sleep deprivation in his medical records, cast some doubt on his claim that the pain was as severe as he asserts. But there is at least a factual dispute regarding the extent and severity of Plaintiff's pain, and the court will assume that jurors who find Plaintiff's testimony credible could also find that he suffered from pain that rendered "the need for treatment . . . obvious to a layperson." *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

## II.     Deliberate Indifference

Assuming that there is, thus, a material dispute over whether Plaintiff suffered from an objectively serious medical condition, he has not provided sufficient evidence for a jury to conclude that any of the Defendants were deliberately indifferent to that condition. Deliberate indifference requires "that the defendants acted with a 'sufficiently culpable state of mind.'" *Peterson v. Wexford Health Sources, Inc*., 986 F.3d 746, 752 (7th Cir. 2021) (quoting *Farmer*,

511 U.S. at 834.)  Deliberate indifference exists "somewhere between the culpability poles of negligence and purpose, and is thus properly equated with reckless disregard."  *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015).  But "objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim" of deliberate indifference.  *Petties*, 836 F.3d at 728.

### A.    Defendant Caradine

Under the Eighth Amendment, a medical professional who has treated a prisoner "is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances."  *McDaniel v. Syed*, 115 F.4th 805, 832 (7th Cir. 2024) (quoting *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019)).  Generally, "a treatment decision must be such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment."  *Id.* (quotations omitted).  "When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted."  *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (emphasis in original).  But "a doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment."  *Id.*

Dr. Caradine has claimed that he exercised professional judgment in treating Plaintiff for on March 5, 2020.  (*See* Caradine Mem. at 8.)  His declaration sets forth his understanding of gingivitis as a non-serious diagnosis, easily resolvable with proper oral hygiene.  (Caradine Decl. ¶ 14.)  He goes on to explain his professional belief that a deep cleaning is not required to resolve gingivitis, and that he met the standard of care appropriate for Plaintiff's presented symptoms. (*Id.* ¶¶ 15–18.)  This is consistent with the undisputed account of the March 5, 2020 appointment, at which he evaluated Plaintiff's gums, diagnosed Plaintiff with gingivitis and advised him on maintaining proper oral hygiene.  *Supra* pp. 7–8.

Plaintiff maintains that Dr. Caradine should have gone beyond providing advice and cleaned Plaintiff's teeth, but he provides no basis for finding that Dr. Caradine's contrary professional judgment was dishonest or a "substantial departure from accepted professional judgment, practice, or standards." *McDaniel*, 115 F.4th at 832. Indeed, Plaintiff admits that a dental cleaning "is not a substitute for good oral hygiene" when treating for gingivitis, and that when he saw Dr. Caradine, he did not suffer from any of the more serious dental conditions that would require treatment that included a deep cleaning. (*See* Pl.'s Resp. to Caradine SOF ¶¶ 13–14.) The court need not determine the exact standard of care for gingivitis given Plaintiff's symptoms; these admissions on the part of Plaintiff demonstrate that Dr. Caradine's course of treatment was not "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett*, 658 F.3d at 751.[12] That Plaintiff believes he should have received a different kind of medical treatment than what he was provided is not a basis for relief under the Eighth Amendment. *See Greeno*, 414 F.3d at 653 ("[N]either medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference.").

---

[12] Plaintiff's admissions also make this case distinguishable from *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938 (7th Cir. 2015), cited in his briefs. (Pl.'s Caradine Opp. at 11.) In *Dobbey*, the inmate plaintiff suffered from a tooth abscess and the Defendant dentist continued to postpone the appointment, causing prolonged pain and suffering. 806 F.3d at 939. In finding that the district court improperly granted summary judgment in favor of the dentist, the Seventh Circuit observed that "[a] dentist demonstrates deliberate indifference by failing to treat the patient promptly, thus prolonging the patient's pain, while knowing that the patient may well be in serious pain that is treatable." *Id.* at 940. The Seventh Circuit recognized that "[a]ny minimally competent dentist who knows that a patient has reported an abscess also knows that if the report is correct the patient needs prompt medical treatment." *Id.* But here, Plaintiff has made no showing that "any minimally competent dentist" would perform a dental cleaning for gingivitis—indeed, he admits that a professional cleaning is *not* the primary treatment. (Pl.'s Resp. to Caradine SOF ¶ 14.) Moreover, Dr. Caradine did not refuse to provide treatment or needlessly delay Plaintiff's appointment: he evaluated Plaintiff's gums on the day of the scheduled appointment and provided treatment in the form of advising on good oral hygiene.

### B.     Nurse Defendants

By any formulation of the culpability required for deliberate indifference, Defendant Emmole was not indifferent to Plaintiff's complaints of pain.  It is undisputed that Emmole recorded Plaintiff's level of pain, evaluated his mouth for signs of bleeding or discomfort, confirmed that Plaintiff was refusing over-the-counter medication, and added Plaintiff to the list to see a dentist per his requests.  (*See* Emmole Progress Notes at 1.)  It is further undisputed that Plaintiff did have a dentist appointment less than two weeks after Emmole placed him on the list.  *See supra* p. 7.  Given that Emmole was not trained in dentistry and could only provide over-the-counter pain medication (which Plaintiff refused), placing Plaintiff on the list to see a dentist was the most she could have done to address his complaints of pain.

Plaintiff takes issue with Emmole's treatment only in that she "classified his condition as non-emergency and referred him to the dental unit in the ordinary course."  (Pl.s IDOC Opp. at 10.)  He argues this decision resulted in an unconstitutional delay in his receiving dental care. (*Id.*)  It is true that "a physician's delay, even if brief, in referring an inmate to a specialist in the face of a known need for specialist treatment may also reflect deliberate indifference."  *Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021); *see also Petties*, 836 F.3d at 730 ("[A]nother type of evidence that can support an inference of deliberate indifference is an inexplicable delay in treatment which serves no penological interest.")  But this is not a case where Emmole waited, for no reason, to place Plaintiff on the list to see a dentist; she confirmed Plaintiff was on the list to see a dentist in her progress notes during the February 22 appointment.  (*See* Emmole Progress Notes at 1.)  Plaintiff speculates, without evidence, that Emmole's decision to classify Plaintiff's condition as non-emergent delayed his eventual treatment, but it is clear from the record that Emmole made this decision after evaluating Plaintiff's mouth and finding no signs of discomfort or bleeding.  Plaintiff has provided no basis for a jury to find that Emmole made this classification due to deliberate indifference, rather than her reasoned judgment.

18

Ferris, unlike Emmole, did not place Plaintiff on the list to see a dentist. But Ferris did provide treatment to Plaintiff in response to his asserted "gum discomfort," by advising him on proper oral hygiene practices. (*See* Ferris Progress Notes at 1–2.) In doing so, she was acting as a medical professional in accordance with her treatment protocols, and deference is due to that decision "unless no minimally competent professional would have so responded under those circumstances." *McDaniel*, 115 F.4th at 832. As discussed *supra* p. 17, recommending good oral hygiene practices is fully within the realm of acceptable treatment of gingivitis-related gum pain— Plaintiff cannot show that no minimally competent professional would have taken Ferris' course of treatment, particularly because Dr. Caradine did exactly as she did just four months later. Ferris offered pain and anti-inflammatory medication, but Plaintiff declined those offers, denied having cavities, and received advice on oral hygiene from Ferris consistent with (at least) minimum competence. Moreover, Ferris ensured that Plaintiff would receive further medical treatment by scheduling a follow-up medical appointment with a nurse practitioner, which occurred just four days later. *See supra* p. 5.

### C. Correctional Counselors

Non-medical officials, like correctional counselors, can be liable for deliberate indifference only in limited circumstances. Because "non-medical defendants . . . can rely on the expertise of medical personnel," if a prisoner is receiving treatment, "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett*, 658 F.3d at 755. Such a defendant may be found liable for deliberate indifference "where they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (quotations omitted). When a plaintiff claims he communicated a serious condition and mistreatment to a non-medical official, plaintiff must show that "the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Arnett*, 658 F.3d at 755 (quotations omitted).

19

Like *Arnett*, "[t]his is not a case where [Plaintiff] was being completely ignored by medical staff," and Plaintiff does not allege that either Payne or Terry "condoned or approved the medical staff's alleged refusal to provide him medical care, impeded their ability to provide effective treatment, or was in a position to take corrective action." *Id.* at 756. Instead, it is undisputed that Payne and Terry received Plaintiff's grievances only after Plaintiff had already been treated by Nurse Ferris, Nurse Emmole, and Dr. Caradine. It is further undisputed that, in responding to Plaintiff's grievances, Payne and Terry obtained statements from the nursing staff and from the dental staff, and confirmed that Plaintiff was obtaining care in response to his complaints of dental pain. *See supra* pp. 8–11; (Pl.'s Resp. to IDOC SOF ¶¶ 9, 13.) Plaintiff offers no evidence that they had reason to believe that the information they were receiving from Nurse Carpenter or Dr. Schmidt was inaccurate. Absent any clear indications of mistreatment or non-treatment), Payne and Terry were entitled to rely on the judgment of the medical professionals. *Arnett*, 658 F.3d at 755. That they may have been aware that Plaintiff was not receiving "the specific [treatment] he sought" does not give rise to deliberate indifference. *Id.* at 756; *see also Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) ("A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service.")

It is difficult to understand Plaintiff's assertions of deliberate indifference on the part of Defendants Payne or Terry. He suggests that the argument that Terry and Payne may rely on the judgment of medical professionals is "a convenient one" that unfairly "pushes blame over to the doctors and nurses on the prison staff." (Pl.'s IDOC Opp. at 8.) But that explanation is consistent with the law of this Circuit, and it "follows naturally from the division of labor within a prison" that medical professionals who are best situated to address an inmate's medical needs are primarily responsible for doing so. *Arnett*, 658 F.3d at 755 (quoting and adopting reasoning from *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). While Plaintiff faults Payne and Terry for failing to talk to the "principal actors," namely Dr. Caradine, when evaluating his grievance (Pl.'s

IDOC Opp. at 9), even negligence in a grievance investigation does not amount to deliberate indifference. *Hayes*, 546 F.3d at 527 (holding that grievance officers were not indifferent to medical need where "[a]t worst, they may have been negligent in failing to investigate further after receiving the summaries from the medical staff, but negligence is not deliberate indifference"). No evidence in the record suggests that Payne and Terry had reason to know that Plaintiff's medical treatment amounted to "mistreatment" or "non-treatment." They are entitled to summary judgment.

## CONCLUSION

Plaintiff's desire for a deep dental cleaning has generated two lawsuits. It appears that such a cleaning, however effective it may or may not have been in alleviating his claimed pain, is not standard practice in the facilities where he has been housed. The court does not comment on the wisdom of this, but concludes that Plaintiff has not established a dispute of fact in support his claims of deliberate indifference against any of these Defendants. Their motions for summary judgment [113, 124] are granted. The Clerk is directed to enter judgment in favor of Defendants.

ENTER:

Dated: March 24, 2025

REBECCA R. PALLMEYER
United States District Judge